UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
KARGO GLOBAL, INC.,                      :

                     Plaintiff,          :   __

                                         :
        V.                               :   06 Civ. 550 (JFK)
                                         :   **OPINION & ORDER**
ADVANCE MAGAZINE PUBLISHERS, INC.,       :
                                         :
                     Defendant.          :
----------------------------------------X


**APPEARANCES**



        For Plaintiff Kargo Global, Inc.:

                DANGEL & MATTCHEN, LLP
                10 Derne Street
                Boston, MA 02114
                     Of Counsel:    Edward T. Dangel, III, Esq.

        For Defendant Advance Magazine Publishers, Inc.:

                FITZPATRICK, CELLA, HARPER & SCINTO
                30 Rockefeller Plaza
                New York, NY 10112
                     Of Counsel:    Edward E. Vassallo, Esq.
                                    Robert H. Fischer, Esq.



**JOHN F. KEENAN, United States District Judge.**


1

**JOHN F. KEENAN, United States District Judge:**

## BACKGROUND

This action stems from the claim of Plaintiff Kargo Global, Inc. ("Kargo") that its "KARGO" trademark was infringed by Defendant Advance Magazine Publishers, Inc.'s ("Advance"'s) publication of the now-defunct <u>Cargo</u> magazine.  This Opinion addresses (1) Advance's motion to preclude the consumer confusion survey and testimony of Kargo's expert, Dr. Jacob Jacoby; (2) Advance's motions to preclude the reports and accompanying testimony of Kargo's damages experts, Thomas Nelson and Gary Singer; (3) Advance's motion to preclude the "rebuttal" reports and accompanying testimony of Plaintiff's experts Russell Winer, who defends Jacoby's opinion, and Leon Kaplan, who defends Singer's opinion; (4) Advance's motion to preclude Kargo from introducing certain damages evidence as a sanction for Kargo's alleged discovery violations; and (5) Kargo's motion to preclude portions of the report and testimony of Advance's expert, Itamar Simonson, regarding the purported bias of Kargo's experts and the results of a study conducted by Advance that shows that there is no awareness of Kargo's brand among consumers.

For the following reasons, Advance's motion to preclude the consumer confusion survey and testimony of Dr. Jacoby is granted.  Advance's motions to preclude the reports and testimony of Kargo's damages experts, Thomas Nelson and Gary Singer, are

2

also granted.  Advance's motion to preclude the reports and testimony of Kargo's "rebuttal" experts is dismissed as moot. Advance's motion to preclude Kargo from offering certain damages evidence is in part granted, in part denied, and in part dismissed as moot.  Kargo's motion to preclude portions of the testimony of Advance's expert, Itamar Simonson, is in part dismissed as moot and in part denied.

Plaintiff Kargo is a distributor of online content to wireless devices.  Kargo's direct customers are wireless carriers and publishers of online content who use Kargo's services and software to deliver wireless features, such as magazine text, ringtones, and video games, to cellphones, pagers, and other personal wireless electronic devices.  Kargo's mark frequently appears alongside the brand of the wireless carrier or publisher (in the form, for example, of "[magazine title] POWERED BY KARGO") when an individual downloads content into his or her cellphone or other wireless device.

Defendant Advance (d/b/a Condé Nast) publishes numerous well-known print magazines.  Advance launched Cargo magazine and its companion website, cargomag.com, in March 2004.  Cargo was essentially a men's shopping magazine, targeted toward males aged 20-45.  Cargo reviewed and promoted clothes, cars, electronic gadgets, and other luxury items which presumably were of interest to its target audience.  Although Cargo occasionally reviewed or

3

promoted wireless devices and features, the magazine devoted only a small percentage of its overall content to coverage of wireless goods and services.  Cargo had a relatively short life span of twenty issues.  The last issue (listed as the May 2006 issue) appeared in April 2006 and the website was shut down in July 2006.

Kargo commenced this action on January 24, 2006, asserting causes of action for false designations of origin, false descriptions and representations, and trademark infringement in violation of the Trademark Act of 1946 ("Lanham Act"), 15 U.S.C. §§ 1114, 1125(a), and for related state and common law claims.  In its Complaint, Kargo alleged that Advance's use of the "cargo" name in Cargo magazine and on the cargomag.com website infringed on Kargo's registered "KARGO" trademark.[1]  Kargo sought injunctive relief, damages for corrective advertising, Advance's profits from its infringement, compensatory damages (as treble damages pursuant to the Trademark Act), and punitive damages, and demanded a jury trial.

Pursuant to a stipulation between the parties, Advance ceased publication of Cargo after the appearance of the May 2006

---

[1]For purposes of the instant motions, it is undisputed that Kargo holds a valid, registered mark and is the senior user.  The KARGO mark is actually owned by ACK Ventures, a company owned by Kargo's CEO, Harry Kargman.  ACK Ventures licenses the exclusive use of the KARGO mark to Kargo.  The license is renewed on a yearly basis.

issue and shut down the companion website in July 2006, thus rendering moot Kargo's claim for injunctive relief.  In addition, Kargo evidently has relinquished its claim for Advance's profits, because, as Advance disclosed in discovery, Advance realized no profits but rather incurred losses of over $30 million in connection with the promotion and publication of <u>Cargo</u>.

        Kargo's claims of liability are based on the theory of "reverse" confusion, in which a second comer, who is better known than the senior user, infringes on the senior user's mark, resulting in the mistaken belief among consumers that the senior user's goods or services are produced by the second comer.  Thus, Kargo claims that the existence of <u>Cargo</u> magazine and its website caused prospective end users of products distributed by Kargo to believe that Kargo's offerings actually were produced by <u>Cargo</u> magazine.  Although Kargo's Complaint alleged anecdotal confusion among Kargo's existing and prospective direct business-to-business customers, Kargo's claims now appear to be based solely on allegations of "reverse" confusion among individual end users. Kargo's theory of harm is that individuals who downloaded content into their personal wireless devices experienced "negative" confusion as a result of <u>Cargo</u>'s infringement; therefore, those end users were and will continue to be less likely to use Kargo's services in downloading wireless content.  In turn, Kargo contends, Kargo's direct business-to-business customers will be

less likely to partner with Kargo.  The sole evidence of actual confusion among end users that Kargo has offered is the consumer confusion survey that was designed by Kargo's expert, Dr. Jacob Jacoby (the "Jacoby Survey"), the results of which are described and analyzed in Jacoby's expert report (the "Jacoby Report").

Kargo contends that, as a result of the confusion caused by the existence of the <u>Cargo</u> magazine and website during the magazine's twenty-issue run, Kargo's brand suffered a loss in value of $5.02 million and that an award of $8.17 million is required to fund an extensive corrective advertising campaign to repair the damage caused by the confusion.[2]

---

[2]Kargo's claim for compensatory damages of $8.17 million is based on the theory of "prospective corrective advertising". Under this legal theory, damages may be awarded to a plaintiff even absent any evidence that a plaintiff made corrective advertising expenditures to remedy the harm caused by a defendant's trademark infringement.  To recover under a claim for "prospective corrective advertising", a plaintiff "must show that it was financially  incapable of undertaking effective concurrent corrective advertising measures to counteract" the trademark infringement." <u>Playtex Prods. v. Procter & Gamble Co.</u>, No. 02 Civ. 8046 (WHP), 2003 U.S. Dist. LEXIS 8913, at *23-24 (S.D.N.Y. May 28, 2003).  The Southern District has characterized prospective corrective advertising as "an extraordinary remedy," <u>Lurzer GmbH v. American Showcase, Inc.</u>, 75 F. Supp. 2d 98, 101 (S.D.N.Y. 1998), and no court in this Circuit has ever awarded damages under that theory.

To place Kargo's multi-million dollar damages claim in perspective, it is worth noting that in 2005, Kargo's most profitable year, Kargo stated on its federal tax return that the company's collective assets were worth $435,931. (Mem. in Support of Def. Mot. to Exclude the Testimony of Pl.'s Expert Gary Singer, Ex. N.)

The instant motions were fully briefed and filed with the Court on April 27, 2007, and the Court heard oral argument on June 5, 2007.

## DISCUSSION

*I. Advance's Motion to Preclude the Consumer Confusion Survey and Report of Dr. Jacob Jacoby*

Advance has moved pursuant to Rules 702 and 403 of the Federal Rules of Evidence to preclude the Jacoby Survey and Jacoby's accompanying testimony.  The Jacoby Survey purports to show the existence of "reverse" confusion among prospective end users of wireless features offered by Kargo.  Advance contends that the survey's methodology is so flawed as to render the survey, and Jacoby's proposed testimony regarding the survey, inadmissible.

*A. The Jacoby Survey*

*(i) Dr. Jacoby's Qualifications*

Although Advance's memorandum of law cites a number of cases in which Jacoby's surveys were criticized, and although Kargo, in its opposition brief, hotly defends Jacoby's renown as a survey expert and cites numerous cases in which courts have praised Jacoby's surveys, there is no real dispute regarding Jacoby's qualifications as an expert witness.  Since 1973, Jacoby has designed and administered over 500 consumer confusion surveys and has qualified as an expert on survey research in over 150 cases.  Citations to his scholarship on consumer surveys are

7

sprinkled liberally throughout <u>McCarthy on Trademarks and Unfair Competition</u>, a leading treatise on trademark law.  Jacoby is clearly a qualified expert on consumer confusion surveys.

*(ii) Survey Methodology and Results*

Jacoby was retained by Kargo in April 2006.  He conducted two surveys on the likelihood of "reverse" confusion resulting from Advance's use of the "cargo" mark in connection with the publication of <u>Cargo</u> magazine and its companion website. One survey consisted of participants from the defendant's universe of prospective consumers (that is, prospective readers of <u>Cargo</u> magazine), and one consisted of participants from the plaintiff's universe of prospective consumers (that is, prospective end users of wireless features offered by Kargo).

Here, because Kargo is claiming that "reverse" confusion exists, the relevant survey for purposes of demonstrating actual consumer confusion is that of Kargo's universe of prospective purchasers.  When "the relevant issue is whether consumers mistakenly believe that the senior user's products actually originate with the junior user, it is appropriate to survey the senior user's customers." <u>Sterling Drug v. Bayer AG</u>, 14 F.3d 733, 741 (2d Cir. 1994).  Thus, only

Jacoby's survey of Kargo's prospective universe of customers is relevant to show consumer confusion.[3]

The Jacoby Survey purports to show that 15.5% of prospective consumers of wireless features offered by Kargo were "confused" in their belief that Kargo is sourced by or related to Cargo magazine.  The survey was conducted as follows.

At Jacoby's direction, an internet survey firm invited some of its panel members to participate in the survey.  For the survey of Kargo's universe, participants were required to be males, aged 17 to 45, who resided in the United States.  In addition, participants who worked in advertising, marketing, or for a company that offered wireless cell phone services were excluded.  Participants who did not read or skim a magazine at least once per month or did not own a cell phone or plan to buy a cell phone within the next year were also excluded.  Further, participants who did not currently have or would not consider obtaining within the next year various wireless products for their cell phones (for example, ringtones, video games, music videos, and magazine content) were also excluded.

---

[3]The survey of the defendant's universe of prospective consumers was conducted at the behest of Kargo's damages expert, Gary Singer.  The results of that survey were incorporated in Singer's expert report to help prove damages but are not relevant to Kargo's attempt to prove actual consumer confusion.

The qualifying participants were then permitted to take a multi-question internet survey, which took approximately seven minutes to complete.[4]

The initial phase of the survey consisted of showing the respondents materials from Cargo magazine.  Each respondent was first informed that he would be shown a cover of a magazine and then a representative page of that magazine.   The respondent was then shown the cover from the September 2005 issue of Cargo, which displayed, among other things, the "CARGO" logo, a picture of the tennis player Andy Roddick, and several large-font "headlines" that announced the issue's contents (for example, "THE TOP CARS OF 2006").  Included on the cover was a prominently displayed picture of a cell phone, to the side of which was printed the headline "World's Most Distinctive Cell Phone". (Def. Mem. in Support of Def. Mot. to Exclude the Testimony of Pl.'s Survey Expert Dr. Jacob Jacoby ("Def. Mem. Exclude Jacoby"), Ex. C.)

Each participant was then shown a page from the interior of the September 2005 issue of Cargo that contained promotional features relating to the magazine's companion website.  The page included the "CARGO" logo and the "cargomag.com" logo, above which was printed the heading "MORE

---

[4]Respondents who completed the survey were given a monetary reward.

AMAZING FEATURES AND PRODUCT REVIEWS ONLINE."  The page also
contained a promotional paragraph entitled "Cargo-to-Go", which
displayed a picture of a Blackberry cellphone, and advertised the
website's "Instant Replay" feature, which allowed visitors to
cargomag.com to download content from <u>Cargo</u>, such as product
reviews, into their cellphones. (<u>Id.</u>, Ex. D.)  Respondents were
allowed to take as much time as they wished to examine the <u>Cargo</u>
materials.

     The next phase of the survey consisted of three short
"distractor" questions, in which respondents were asked about
their television viewing habits, attendance at sporting events,
and the number of adults living in their households.  According
to Jacoby, the "distractor" questions were designed to be
answered in 30 to 45 seconds.

     The next phase consisted of showing the participants
materials that contained the "KARGO" mark.  Each participant was
first informed that he would next be viewing a "magazine ad that
appeared in <u>Premiere</u> magazine." (<u>Id.</u>, Ex. B at 26, ¶ 44.)  The
respondent was then shown an advertisement for "<u>Premiere</u> Mobile",
a service which allows cellphone customers to download <u>Premiere</u>'s
content onto their cellphones.  The advertisement included the
words "Powered by KARGO", with Kargo's logo prominently displayed
in large font. (<u>Id.</u>, Ex. E.)

Each respondent was then informed that the "next ad you will see is for a service available for cell phone users." (Id., Ex. B at 26, ¶ 45.)  The respondent was then shown a blown-up picture of a Blackberry cellphone, with the "KARGO" logo displayed in large font above the picture.  (Id., Ex. F.) Respondents were given as much time as they wished to examine the Kargo materials.

Each respondent then was asked a series of multiple choice questions designed to ascertain whether he believed there was any connection regarding source, business relationship, or sponsorship between the company that produced the materials for Cargo magazine and the company that produced the "ads" that displayed the "KARGO" logo.  First, each respondent was asked a question intended to detect "source confusion":

> Q4.  If you have any thoughts about it, do you think these ads from Premiere Magazine and for the cell phone service you just saw...?
>
> do come from the same company that put out the magazine you looked at earlier in the survey
>
> do not come from the company that put out the magazine you looked at earlier in the survey
>
> Don't know.[5]

(Id., Ex. B at 27, ¶ 47.)

Respondents who answered that they thought the "ads" came from the same company that produced the magazine (i.e.,

_____

[5]The order of the "do" and "do not" answer choices was rotated from respondent to respondent.

<u>Cargo</u>) were then asked to state "what makes you say that these ads come from the same company that put out the magazine you looked at earlier?" (<u>Id.</u>)

Respondents who did not answer that they believed that the <u>Cargo</u> and KARGO materials came from the same source were given the following "relationship confusion" question:

> If you have any thoughts about it, do you think the ad from Premiere Magazine and the cell phone service you just saw
>
> come from a company that <u>does</u> have a business connection or relationship with the company that put out the magazine you looked at earlier in this survey
>
> come from a company that does <u>not</u> have a business connection or relationship with the company that put out the magazine you looked at earlier in this survey
>
> Don't know.[6]

(<u>Id.</u>, Ex. B at 27, ¶ 48.)

Respondents who answered that they thought there was a connection between the company that produced the "ads" and the company that put out the magazine were then asked to state why they thought that a connection existed.

Respondents who answered that they did not believe there was a connection between the companies were then asked two "sponsorship confusion" questions.  First, respondents were asked whether they thought that "the company that offers the cell phone

---

[6]As with the answers for the previous question involving "source confusion", the order of the answer choices for this question also was rotated from respondent to respondent.

service you just saw and placed the ad in Premiere Magazine"
needed to get permission from another company in order to use the
name that the "ad" companies used. (Id., Ex. B at 28, ¶ 49.)
Respondents who answered that they believed the company that put
out the "ads" needed to get permission to use the name in the
"ads" were then asked to state the name of the company from which
permission was needed.  Finally, the respondents were asked to
state why they believed that permission was required from the
company they had named.[7]

The survey also was administered to a group of
"control" respondents.  The "control" survey was identical to the
survey described above, except that everywhere the word "CARGO"
appeared on the cover page and interior magazine page, it was
replaced by the word "CARRY".

The Jacoby Survey utilized a two-pronged test to
determine whether a respondent could be counted as "confused".
In order to be counted as "confused", a respondent first had to
answer one of the three initial multiple choice questions
affirmatively, indicating that he believed that the Kargo "ads"
either (1) came from the same source as the Cargo or Carry
magazine that was displayed; (2) came from a company that had a
business connection with Cargo or Carry magazine; or (3) came

---

[7] The Jacoby Survey included an additional three questions
which are not relevant to the instant motion.

from a source that was required to obtain permission from <u>Cargo</u> or <u>Carry</u> magazine.  Next, when asked to state the reason for his answer as to the initial multiple choice questions, the respondent "had to give an answer that referred to the names <u>Cargo</u> (<u>Carry</u>) and <u>Kargo</u> or the equivalent." (<u>Id.</u>, Ex. B at 33, ¶ 56(b)).  Thus, a participant who indicated that he believed there was a connection as to source, relationship, or sponsorship between the <u>Cargo</u> (or <u>Carry</u>) materials and the Kargo materials, but who then did not refer to the similarity of the companies' names when asked why he thought there was a connection, would not be counted as "confused" in the final tally.

Of the 328 participants who took the test survey (i.e., who were shown the <u>Cargo</u> and Kargo materials), 17.7% were tallied as "confused".  Of the 230 participants who took the control survey (i.e., who were shown the <u>Carry</u> and Kargo materials), 2.2% were tallied as "confused".  The Jacoby Report states that the net confusion, calculated as the difference between the confusion among participants in the test survey minus the confusion of the participants in the control survey, was 15.5%.[8]  In addition,

_____

[8]The percentage of confusion occurring among participants in the control group is subtracted from the percentage of confused participants in the test group, pursuant to standard protocol, as "noise" that should be discarded.  "In an experiment or statistical study, the 'noise' is the variation in the data being collected that is not believed to be caused by the variables being tested." <u>Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.</u>, 198 F. Supp. 2d 474, 483 n.13 (S.D.N.Y. 2002).

although not stated in the Jacoby Report, 80% of respondents in
the control group answered one of the initial multiple choice
questions affirmatively, thus demonstrating that they believed
there was a connection as to source, business relationship, or
sponsorship between the companies that produced the <u>Carry</u> and
Kargo materials.

*B. Analysis*

Federal Rule of Evidence 702 provides that expert
testimony concerning technical or specialized knowledge is
admissible to assist the trier of fact if "(1) the testimony is
based upon sufficient facts or data, (2) the testimony is the
product of reliable principles and methods, and (3) the witness
has applied the principles and methods reliably to the facts of
the case." Fed. R. Evid. 702.  To be admissible, expert testimony
must be both relevant and reliable. <u>Daubert v. Merrell Dow
Pharmaceuticals, Inc.</u>, 509 U.S. 579, 589 (1993).

Survey evidence is generally admissible to establish
actual confusion in cases alleging violations of the Lanham Act.
<u>Schering Corp. v. Pfizer Inc.</u>, 189 F.3d 218, 227-28 (2d Cir.
1999).  To be probative of confusion "the survey must. . . have
been fairly prepared and its results directed to the relevant
issues." <u>Universal City Studios, Inc. v. Nintendo Co.</u>, 746 F.2d
112, 118 (2d Cir. 1984).  Although defects in survey methodology
usually go to weight of the evidence rather than its

16

admissibility, a survey should be excluded under Federal Rule of Evidence 403 when its probative value is substantially outweighed by its prejudicial effect or potential to mislead the jury. Schering, 189 F.3d at 228; see, e.g., Starter Corp. v. Converse, Inc., 170 F.3d 286, 297 (2d Cir. 1999). "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." Daubert, 509 U.S. at 595; see also Mastercard Int'l, Inc. v. First Nat'l Bank of Omaha, Inc., Nos. 02 Civ. 3691 (DLC), 03 Civ. 7070 (DLC), 2004 U.S. Dist. LEXIS 2485 (S.D.N.Y. Feb. 23, 2004). Courts have precluded surveys after finding that flaws in methodology are so severe that the survey's probative value is substantially outweighed by its potential for unfair prejudice and confusion. See Vista Food Exch., Inc. v. Vistar Corp., No. 03 Civ. 5203, 2005 U.S. Dist. LEXIS 42541, at *13-15 (E.D.N.Y. Sept. 25, 2005) (collecting cases).

The Jacoby Survey is so flawed that its probative value is substantially outweighed by its potential for unfair prejudice and the likelihood that it will confuse or mislead the jury. Two major defects strip the Jacoby Survey of probative value. Specifically, the survey (1) employed a format that failed to

approximate real world conditions and was impermissibly leading, and (2) used improper stimuli.

The Jacoby Survey's failure to approximate real world conditions severely limits its probative value.  "Germaine survey evidence should make some effort to compare the impressions the marks have on potential customers under marketplace conditions." WE Media v. GE, 218 F. Supp. 2d 463, 474 (S.D.N.Y. 2002); see also Mattel, Inc. v. Azrak-Hamway Int'l, Inc., 724 F.2d 357, 361 (2d Cir. 1983); 3 McCarthy on Trademarks § 23:2.1, at 23-13 (4th ed. 2002) ("While survey evidence is sometimes said to be evidence of 'actual' confusion, it is so only to the extent that the survey mirrors the real world setting which can create an instance of actual confusion.").   A survey's failure to approximate marketplace conditions can provide grounds for the survey's exclusion. See,e.g., American Footwear Corp. v. General Footwear Co. Ltd., 609 F.2d 655, 660 (2d Cir. 1979) (approving lower court's finding that survey was defective "for failure to conduct it under actual marketing conditions"); Vista Food Exch., Inc. v. Vistar Corp., 2005 U.S. Dist. LEXIS 42541 (finding significant reduction in survey's probative value where survey failed to replicate actual marketing conditions).

Here, the back-to-back, or seriatim, display of the Cargo and Kargo marks did not approximate conditions that consumers would encounter in the marketplace.  The products at

18

issue (Kargo's wireless services and Advance's mens shopping
magazine, respectively) were not competing.  Although some
overlap existed in the demographic makeup of both Kargo's and
Cargo's target audiences, the companies were engaged in different
businesses.  Kargo provides content-distribution services to
publishers of online content and wireless carriers.  Its
customers are the businesses that choose to engage Kargo to help
in the distribution of downloadable, wireless content.  Advance
published a mens' shopping magazine.  Its customers were its
readers and visitors to the cargomag.com website.  As Advance
points out, Kargo has offered no data or other evidence to
support the proposition that prospective consumers were likely to
encounter Kargo's trademark a short time after seeing Cargo
magazine.  Despite Jacoby's speculation at his deposition that
"under some circumstances there is this opportunity for people to
see the two [marks] in close temporal proximity," the Court
doubts that a non-negligible number of prospective consumers of
Kargo's products would see Cargo magazine, followed a minute or
less later, by the KARGO logo.  (Def. Mem. Preclude Jacoby, Ex. A
at 210-11.)  The likelihood that a significant number of
consumers would encounter the marks in close proximity is
rendered even more remote by the fact that Cargo ran for only
twenty issues and is no longer published.

Although the Jacoby Survey's seriatim display of the non-competing marks does not alone render the survey inadmissible, it does substantially detract from the survey's capacity to prove a likelihood of consumer confusion.  The back-to-back display of parties' products has been characterized as a "major flaw" in survey methodology. <u>Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.</u>, 198 F. Supp. 2d 474, 484 (S.D.N.Y. 2002).  As another court has stated, "The proper test for likelihood of confusion is not whether consumers would be confused in a side-by-side comparison of the products, but whether confusion is likely when a consumer, familiar to some extent with the one party's mark, is presented with the other party's goods alone." <u>Elizabeth Taylor Cosmetics Co. v. Annick Goutal, S.A.R.L.</u>, 673 F. Supp. 1238, 1248 (S.D.N.Y. 1987).  Here, where Kargo has alleged that "reverse" confusion has occurred because of the infringing use by the better-known <u>Cargo</u> magazine of the lesser-known senior user's (Kargo's) name, it would have been far more replicative of actual marketplace conditions to have displayed only Kargo's materials and then asked the respondents open-ended questions regarding their beliefs about the source, business relationship, or sponsorship of the Kargo materials.  This is known as the "Eveready" format. <u>See</u> <u>Union Carbide Corp. V. Ever-Ready, Inc.</u>, 531 F.2d 366 (7th Cir. 1976); 5 McCarthy on Trademarks and Unfair Competition, § 32:174 at 32-

290, 291(4th ed. 2002) ("A now-standard survey format used to
prove likelihood of confusion in cases where plaintiff makes some
products which defendant does not is the Eveready format.").  A
survey that utilizes the "Eveready" format, by displaying only a
single party's mark and attempting to discern whether respondents
are confused as to the source of the mark, "is much more reliable
because it more accurately approximates actual market conditions"
by ensuring that respondents are not made "artificially aware" of
the other party's trademark.  Nat'l Distillers, 198 F. Supp. 2d
at 484.  Here, the Jacoby Survey's artificial, seriatim
presentation of non-competing marks bears so little resemblance
to the actual experience of consumers, that the confusion the
survey purports to show has very little probative value.

        In addition to failing to approximate actual
marketplace conditions, the survey's back-to-back design was
impermissibly leading.  After viewing the seriatim display of
non-competing products that few if any respondents actually would
have encountered in close physical or temporal proximity in real
life, the respondents were given multiple choice questions in
which they were asked whether they believed a connection, as to
source, business relationship, or sponsorship, existed between
the companies whose marks the respondents had just seen.  Rather
than measure any actual confusion, however, these questions were
far more likely to generate "demand effects" by suggesting the

existence of a connection between the products that the respondents would not have made on their own.  As one court has explained, "[t]he question about whether the two [non-competing] items are put out by the same or a related source is likely to generate so-called 'demand effects' that bias the survey by suggesting to respondents, at least implicitly, that they should believe there is at least some sort of relationship between the different items when the possibility might not even have occurred to the vast majority of consumers who see the items." Simon Prop. Group L.P. v. mySimon, Inc., 104 F. Supp. 2d 1033, 1048 (D. Ind. 2000); see also Gov't Employees Ins. Co. v. Google, Inc., No. 1:04 Civ 507, 2005 U.S. Dist. LEXIS 18642 (D. Va. Aug. 8, 2005) ("[D]emand effect results when the interviewer's questions or other elements of the survey design influence participants' responses by suggesting what the 'correct' answers might be or by implying associations that might not otherwise occur to participants.").  In other words, the mere putting of a question creates the impression of a relationship.

Here, although the survey questions did not refer to the actual names "cargo" and "kargo", there exists a great likelihood that the back-to-back presentation of the parties' marks, followed by questions that asked respondents if they believed the marks were related, suggested to respondents that they should believe that a connection existed between the

companies' marks.  Certainly, in light of the non-competing
nature of the products at issue, the multiple choice questions
that immediately followed the display of the marks implied
connections or associations that otherwise would not have
occurred to the respondents.  Under such circumstances, the
respondents who later stated that they believed that there was a
connection between Cargo and Kargo due to the similarity of the
names, and thus were tallied as "confused", were demonstrating
merely that they had read the names "cargo" and "kargo" in
artificially close proximity.  "Surveys which do nothing more than
demonstrate the respondents ability to read are not always
probative on the issue of likelihood of confusion."  Franklin
Resources Inc. v. Franklin Credit Mgt. Corp., 988 F. Supp. 322,
335 (S.D.N.Y. 1997); see also Universal City Studios, Inc., 746
F.2d at 118; Beneficial Corp. v. Beneficial Capital Corp., 529 F.
Supp. 445, 450 (S.D.N.Y. 1982) (finding that survey did not
establish "meaningful evidence of actual confusion" because
question asking respondents whether there was a business
connection between companies with similar names "establishes no
more than that the names are similar, a factor as to which there
can be little genuine dispute in any event, and that portions of
the general public will make the reasonable assumption, that, in
the absence of any other information, two companies with similar
names are likely to have a business connection").

23

The leading nature of the survey's design is clearly evidenced by the control group's response to the Jacoby Survey. In a consumer confusion survey, the control group is shown "a non-infringing product which is similar to the products at issue." <u>Nabisco v. Warner-Lambert Co.</u>, 32 F. Supp. 2d 690, 700 (S.D.N.Y. 1999). The Jacoby Survey's control group was shown pages of a magazine that replaced the name <u>Cargo</u> with the name <u>Carry</u>. Although the name "Carry" is obviously dissimilar from "Kargo" and thus clearly non-infringing, 80% of the control group respondents indicated in their responses to the initial multiple choice questions that they believed there was some connection involving source, business relationship, or sponsorship between Kargo's "ads" and the pages of <u>Carry</u> magazine. The only plausible explanation for this statistic, which Jacoby did not include in his report, is that the Jacoby Survey was designed (successfully) to lead its respondents to infer that a connection existed between the parties' products. As Advance's expert, Itamar Simonson, stated in his report with unassailable common sense:

> It appears safe to assume that there should not be any marketplace confusion between a men's shopping magazine called 'Carry' and the plaintiff in this case, Kargo. Accordingly, unless the Jacoby Survey procedure and questions were flawed (e.g. leading) we would expect the 'confusion' estimate in the 'Carry' control group to be not much higher than 10%. . . . Thus, even though there was no reason to expect confusion between the 'Carry' men's magazine and the 'Kargo' service, 80[]% of the respondents in the Jacoby Survey control group said that

> Carry and Kargo came from the same source, had a business connection, or Kargo received permission from Carry. These results reflect the extremely leading survey methodology employed in the Jacoby Survey.

(Def. Mem. Preclude Jacoby Survey, Ex. P, at 50, ¶¶ 119-20.)[9]

The Court agrees with Advance's expert that the control group's response to the initial multiple choice questions is strong if not dispositive proof that the survey was designed to lead respondents to conclude that the parties' products were related.

Kargo argues that the high incidence of "confused" responses to the multiple choice questions among test group respondents is irrelevant. Kargo contends that the only respondents who can be counted as "confused" are those who, first, answered one of the multiple choice questions affirmatively and, second, referred to the similarity between the names of the marks. Thus, Kargo argues, a respondent who merely answered one of the multiple choice questions in the affirmative cannot be counted as "confused" and the percentage of respondents who gave affirmative answers to the initial multiple choice questions has no relevance to the issue of whether consumer confusion exists as to the names "cargo" and "kargo".

Kargo misses the point. Although Advance uses the word "confusion" in connection with its discussion of the responses

---

[9]Although Kargo has filed a motion to preclude portions of Simonson's proposed testimony, Kargo has not challenged the admissibility of Simonson's conclusions regarding the statisical results of the Jacoby Survey.

provided by 80% of the test group, Advance does not, and cannot, claim that the test group's response to the survey's initial multiple choice questions demonstrates a likelihood of consumer confusion sufficient to support a claim for monetary damages under the Lanham Act.  In other words, Advance does not cite the 80% statistic insofar as it relates to legal confusion.  Rather, Advance simply contends, and the Court agrees, that the 80% statistic demonstrates that the Jacoby Survey was effectively constructed to lead respondents to conclude that the marks that were displayed came from related sources.

The Jacoby Survey's use of improper and unrepresentative stimuli also detracts substantially from its probative value.  "Typically, trademark infringement surveys use stimuli, such as pictures, advertisements or clothing, that directly expose potential consumers to the products or the marks in question."  Troublé v. Wet Seal, 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001).  To be probative of actual confusion, a survey must use stimuli "that approximate what a potential customer would encounter in making" purchasing decisions.  WE Media, 218 F. Supp. 2d at 474.  A survey that uses stimuli that differ from what a consumer is actually likely to see in the marketplace does not accurately test for actual consumer confusion and thus lacks probative value.  See Conopco, Inc. v. Cosmair, Inc., 49 F. Supp. 2d 242, 253 (S.D.N.Y. 1999).

26

Here, the Jacoby Survey displayed to respondents a purported "ad" for Kargo, in the form of a blown-up photo of a Blackberry cellphone that prominently featured the KARGO logo. That "ad", however, was not an actual advertisement that a prospective user of Kargo's products would ever encounter but rather was a page prepared by Kargo as promotional material, designed for viewing by Kargo's direct, business-to-business customers. Advance points out that, in real life, an end user would see the KARGO mark only on the small screen of his wireless device, in a size substantially smaller than the KARGO mark displayed in the "ad" used in the Jacoby Survey. Although Kargo insists that the "ad" was "an authentic page taken from Kargo's promotional materials," it is undisputed that the "ad" would never be encountered by Kargo's prospective end users, who were the respondents of the Jacoby Survey. (Pl. Opp. to Def. Mot. Exclude Jacoby Survey at 11.) Thus, because Kargo's "mark was not shown as it is used in commerce," Vista Food Exch., Inc., 2005 U.S. Dist. LEXIS 42541 at *15, its use in the survey was improper and further detracts from the survey's probative value.

In addition, the pages of Cargo magazine were not sufficiently representative of Cargo's product. Both the cover and interior page prominently displayed large photos of cellphones. In addition, the interior page was devoted entirely

27

to promotional content relating to the cargomag.com website, and
included a promotional paragraph about Cargo's "Instant Replay"
feature.  The Court agrees with Advance that the content
displayed on the cover and interior page "give[s] an unfair
representation of the editorial content of the 20 issues of Cargo
Magazine." (Def. Mem. Exclude Jacoby Survey at 9.)  Although the
pages were taken from an actual issue of Cargo, a respondent,
viewing the Cargo cover and interior page, would be highly likely
to believe that Cargo was involved in the same line of business
as the company that produced the Kargo "ads", namely, providing
wireless or web-related products and services, when in fact,
Cargo devoted only a small percentage of its overall content to
such products and services.

        Because the seriatim display of the products did not
approximate marketplace conditions and rendered the survey
questions impermissibly leading, and because the survey used
improper or unrepresentative stimuli, the Jacoby Survey has very
limited probative value.  In light of the severely diminished
probative value of the Jacoby Survey,, the danger of unfair
prejudice looms large.  Trial courts are accorded "wide latitude
in excluding evidence that possesses an undue risk of prejudice
or confusion of the issues, or is found to be marginally relevant
to the issues in the case." Starter Corp., 170 F.3d at 296
(internal quotation marks and citation omitted).  Where a

28

trademark action contemplates a jury trial, rather than a bench trial, the court should scrutinize survey evidence with particular care.   As one court has stated:

> The vast majority of reported cases dealing with problematic survey evidence have involved injunction hearings or bench trials. In such cases, the safest course for the trial judge is to admit the evidence and to treat the criticisms as going to the weight of the evidence. . . . This case is scheduled for a jury trial. The court has a responsibility to the jurors not to waste their time or to make their task unduly difficult by admitting evidence that is likely to be complex and time-consuming, as this survey evidence would be, when it offers essentially nothing of real probative value. Rule 403 was written for just this sort of case.

Simon Prop. Group L.P., 104 F. Supp. 2d at 1040.

A jury trial, rather than a bench trial, is contemplated in this case.   The live testimony of Kargo's highly seasoned and impressively credentialed consumer confusion expert, regarding the results of the deeply flawed Jacoby Survey, would prove to be "both powerful and quite misleading." Daubert, 509 U.S. at 595.   The application of Rule 403 is clearly warranted in this case. See Schering, 189 F.3d at 228   (survey subject to "Rule 403's more general prohibition against evidence that is less probative than prejudicial or confusing"); Starter Corp., 170 F.3d at 297 (finding that "district court did not abuse its discretion [in excluding survey] because it found the probative value of the survey so slight that it was easily outweighed, under a Rule 403 analysis, by the danger of confusion of the issues"); see also Universal City Studios, 746 F.2d at 118

29

(finding survey "so badly flawed that it cannot be used to demonstrate the existence of a question of fact on the likelihood of consumer confusion"); Vista Food Exch., Inc., 2005 U.S. Dist. LEXIS 42541, at *21-22 (excluding survey on Rule 403 grounds because it was "flawed to the point that its probative value is substantially outweighed by the survey's potential for unfair prejudice and confusion"); Revlon Consumer Prods Corp. v. Jennifer Leather Broadway, Inc., 858 F. Supp. 1268, 1276 (S.D.N.Y. 1994) (finding survey "so unreliable that it is entitled to no weight"); Exxon Corp. v. Xoil Energy Resourcess, Inc., 552 F. Supp. 1008, 1021 (S.D.N.Y. 1981) (affording survey no weight because survey, among other things, was not "taken under market conditions").  Accordingly, because the Jacoby Survey is so flawed that its probative value is substantially outweighed by the risk of unfair prejudice and the potential that the jury will be misled or confused, the Jacoby Survey and the accompanying testimony of Jacoby are excluded as inadmissible under Rule 403.

*II. Advance's Motion to Preclude Reports and Testimony of Kargo's Damages Experts*

Advance seeks to preclude the expert reports and testimony of Kargo's damages experts, Thomas Nelson ("Nelson") and Gary Singer ("Singer").  Nelson and Singer are employees of Interbrand, Inc., a brand valuation firm.  Kargo engaged Nelson

and Singer as experts on damages caused to Kargo's brand by
Advance's allegedly infringing activities.  Nelson designed five
"bolt on" questions that were added to the end of the Jacoby
Survey.  The "bolt on" questions were intended "to assess the
impacts of any proven confusion on <u>Kargo</u>'s current and future
business outcomes and identify strategy elements for eliminating
or mitigating that confusion through future <u>Kargo</u> brand-building
efforts." (Def. Mem. Exclude Jacoby, Ex. B., at 12, ¶ 23.).
Nelson's expert report (the "Nelson Report") describes and
analyzes the answers given by respondents in the defendant's
universe of prospective consumers the "bolt on" questions.  In
addition, the Nelson Report provides a brief and favorable review
of the methodology of the Jacoby Survey.

 Singer's expert report (the "Singer Report") provides a
calculation of the damage that was inflicted on Kargo's brand
value by Advance's allegedly infringing conduct.  The Singer
Report also calculates the cost of the massive media campaign
that Singer believes will be necessary to counteract the damage
caused by the infringement.  The Singer Report's damages
calculations are based on the results of the Jacoby Survey,
showing the existence of marketplace confusion among prospective
end users of products offered by Kargo.  The Singer Report also
relies on the Nelson Report's findings regarding the extent to
which consumer confusion impacted the value of Kargo's brand.

The findings of Kargo's damages experts relate only to proof of damages and are predicated entirely on the existence of consumer confusion as demonstrated by the Jacoby Survey.  Because the Jacoby Survey and Jacoby's accompanying testimony have been held to be inadmissible under Rule 403, the Nelson Report and Singer Report have been rendered irrelevant and thus inadmissible.  Accordingly, Advance's motions to preclude the reports and accompanying testimony of Nelson and Singer are granted.

*III. Reports of Kargo's "Rebuttal" Experts*

Advance seeks to preclude the "rebuttal" reports and accompanying testimony of Russell Winer and Leon Kaplan, which support the findings and opinions of, respectively, Kargo's experts Jacoby and Singer.  Because the reports and accompanying testimony of Jacoby and Singer have been ruled to be inadmissible, Advance's motion to dismiss any "rebuttal" testimony regarding those reports is moot.

*IV. Advance's Motion to Preclude Certain Damages Evidence as a Sanction for Kargo's Failure to Provide Timely Discovery*

Advance has moved, pursuant to Federal Rules 37(b)(2)(B) and 37(c)(1), to preclude Kargo from offering the following categories of damages evidence:  (i) damages evidence based upon factual assertions that are contained in the Singer Report but were not disclosed to Advance prior to the close of

32

fact discovery; (ii) any evidence of damages in excess of
$10,400, the value of Kargo's collective assets as stated in a
December 2004 appraisal; (iii) any evidence relating to damages
that were caused by Advance's ceasing to publish Cargo magazine;
and (iv) any evidence that Kargo lost customers as a result of
Advance's alleged infringement.

Under Federal Rule 26(a)(1), a party seeking damages
must provide the opposing party with a computation of the damages
sought and "the documents or other evidentiary material . . . on
which such computation is based . . . ."  This requirement is
effective even if the opposing party does not specifically
request this material. See Fed. R. Civ. P. 26(a)(1).  Further,
under Rule 26(e), a party seeking damages is required to provide
supplementing responses to the other party's document demands and
interrogatories.

Under Federal Rule 37, a court may impose sanctions
against a party for failing to meet the obligations of Rule 26.
Specifically, under Rule 37(b)(2), a court may impose sanctions
for failure "to obey an order to provide or permit discovery . .
. ." Fed. R. Civ. P. 37(b)(2).  Sanctions may include an order
prohibiting the sanctioned party "from introducing designated
matters into evidence." Rule 37(b)(2)(B).  "Provided that there
is a clearly articulated order of the court requiring specified
discovery, the district court has the authority to impose Rule

37(b) sanctions for noncompliance with that order." <u>Daval Steel Products v. M/V Fakredine</u>, 951 F.2d 1357, 1363 (2d Cir. 1991). In addition, Rule 37(c)(1) provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed." Fed. R. Civ. P. 37(c)(1). "The rules are designed to avoid surprise or trial by ambush." <u>American Stock Exchange, LLC v. Mopex, Inc.</u>, 215 F.R.D. 87, 93 (S.D.N.Y. 2002) (internal quotation marks and citation omitted). Preclusion of evidence is considered to be a drastic remedy and "is generally a disfavored action." <u>American Stock Exchange, LLC</u>, 215 F.R.D. at 93.


*(i) Preclusion of Damages Evidence Based on Assertions Contained in the Singer Report*

        Advance seeks to preclude Kargo from introducing certain factual assertions that were contained in the Singer Report but that Kargo allegedly failed to provide to Advance prior to the close of fact discovery. Because the Singer Report and Singer's accompanying testimony are precluded, however, Advance's application to bar Kargo from offering assertions contained in the Singer Report has been rendered moot.

*(ii) Preclusion of Evidence of Damages in Excess of $10,400*

Advance argues that as a matter of law, a plaintiff cannot recover compensatory damages that are greater than the value of the allegedly damaged asset.  Therefore, Advance contends that Kargo's claim for compensatory damages should be limited to $10,400, the value of Kargo's collective assets as stated in a December 2004 appraisal.  The appraisal appears to have been conducted for tax purposes, when Kargo's assets were transferred from Kargo's predecessor to ACK Ventures, the company owned by the family of Kargo's CEO, Harry Kargman, and the licensor of the "KARGO" mark.

Kargo argues that the viability of Kargo's legal theory of damages does not present a discovery issue that may be resolved on a Rule 37 motion.  The Court agrees.  Advance has identified no relevant discovery violation and has cited no authority for the proposition that, under Rule 37, Kargo should be precluded from seeking damages in excess of the valuation of the company's assets as listed in a December 2004 appraisal that was conducted for tax purposes.  Although Advance may ultimately prove to be correct in asserting that Kargo's claim for damages under its theory of "prospective corrective advertising" cannot survive as a matter of law, that issue is appropriately decided on a motion for summary judgment, not on a motion to preclude evidence as a sanction for discovery violations.  Accordingly,

Advance's application to preclude evidence of damages in excess of $10,400 is denied.

*(iii) Preclusion of Evidence of Damages Based on Advance's Cessation of Publication of* Cargo

Advance argues that Kargo should be precluded from arguing that Advance's shutting down of <u>Cargo</u> magazine and the cargomag.com website caused Kargo to suffer damages.  Advance contends that there simply is no support in law for the proposition that the "cessation of an act of alleged infringement – i.e., compliance with plaintiff's prayer for relief – is itself grounds for monetary relief." (Def. Mem. Preclude at 10.)

Again, Advance has failed to identify any discovery violation that warrants preclusion of evidence under Rule 37. Whether <u>Cargo</u>'s cessation is a factor that may be considered in determining the extent of Kargo's damages may prove to be a contested issue at the summary judgment stage, but Advance has not shown that Kargo failed to make timely disclosure to Advance of any fact or set of facts relating to <u>Cargo</u>'s cessation. Advance's motion to preclude Kargo from offering evidence of <u>Cargo</u>'s cessation as a contributing factor to consumer confusion is therefore denied.

*(iv) Preclusion of Evidence of Lost Customers as a Result of Advance's Infringement*

Advance seeks to preclude Kargo from offering any evidence of lost direct customers as a result of confusion caused by Advance's alleged trademark infringement.  According to Advance, Kargo has provided no discovery to show that Kargo lost any wireless carriers or any other direct customers as a result of Advance's alleged infringement.  Rather, Kargo's damages claims are based on survey evidence showing confusion among "young males attracted to <u>Cargo Magazine</u> and its website's offerings and those interested in obtaining mobile content from magazines and websites through Kargo."(Pl. Further Opp. to Def. Mot. to Preclude, Ex. 1, at 5.)  Kargo does not oppose Advance's application.  Thus, because Kargo has not alleged the loss of direct business-to-busines customers, has provided no discovery regarding the loss of such customers, and does not oppose Advance's application, Kargo is precluded from offering at trial evidence of lost direct customers.

*V. Kargo's Motion to Preclude Portions of the Report and Accompanying Testimony of Advance's Expert, Itamar Simonson*

Kargo has moved, pursuant to Rules 403 and 702, to preclude Advance's expert Itamar Simonson ("Simonson") from testifying about (1) purported bias on the part of Kargo's experts as shown by internal documents exchanged between Kargo's experts, attorneys, and management; and (2) results of a research

study that tend to show there is zero awareness of Kargo among both <u>Cargo</u>'s and Kargo's target audiences.

Kargo's application to preclude Simonson from testifying about the purported bias of Kargo's experts, as revealed in various documents exchanged among Kargo's experts, attorneys, and management, is moot, because the reports and accompanying testimony of the experts at issue (namely, Jacoby, Nelson, and Singer) have been ruled inadmissible.

Kargo also has moved to preclude Simonson from testifying that there is no awareness of Kargo's brand among consumers.  Simonson's conclusion is based on a research survey conducted by the Opinion Research Center ("ORC", the "ORC Survey").  The ORC Survey was conducted over the telephone among two pools of respondents, who were varied in age, sex, employment status and other demographic attributes.  In the first pool, 231 respondents were asked whether they associated the name "KARGO" (spoken as "Kargo" and then spelled out) with any products or services.  Nineteen respondents replied "yes" to the question. The name "KARGO" was then spelled out again for those nineteen respondents, and they were asked to state with what products or services they associated the name "KARGO".  None of the respondents replied that they associated KARGO with cellphones,

wireless products, or any other service or product remotely associated with Kargo's business.[10]

The second pool consisted of 246 respondents. The respondents first were asked whether they associated the phrase "Powered by Kargo" with any products or services. Thirteen respondents replied affirmatively. The thirteen respondents were then asked to state with what products or services they associated the phrase "Powered by Kargo." Again, none of the respondents replied that they associated the phrase with cellphones, wireless products, or other services or products with which Kargo is involved. Based on the results of the ORC Survey, Simonson concluded that there was no awareness of Kargo among the population.

Kargo argues that the survey's results are inadmissible because only eight of the respondents who initially replied that they associated the name "Kargo" or the phrase "Powered by Kargo" with particular products or services were members of Kargo's target audience of 18-44 year olds. Kargo contends that this number constitutes far too small a sample from which to form any meaningful conclusion about consumer awareness of the Kargo brand. Kargo concedes that questions about insufficient sample size generally goes to weight rather than admissibility.

---

[10]Not surprisingly, the nineteen respondents tended to associate the name "KARGO" with clothing and shipping.

Nevertheless, Kargo maintains that "it makes a mockery of Rule 403 and Rule 702 to allow [Simonson] to opine that Kargo was unknown among its target demographic audience on such an exceedingly slim reed." (Pl. Mem. Exclude Simonson at 17.)

Advance counters that the two pools of respondents included a total of 255 respondents who were between the ages of 18 and 44, and that none of the 255 responded that they associated either "Kargo" or "Powered by Kargo" with products or services that Kargo actually offers.  Advance claims that this sample size of the relevant demographic is more than sufficient for Simonson to conclude that there is zero consumer awareness of the Kargo brand.

There is no allegation that the survey questions were improperly designed, impermissibly leading, or that the methodology was otherwise flawed.  As both parties concede, Kargo's sole objection, regarding sample size, is a matter of weight rather than admissibility.  See United States Info. Sys. v. Int'l Bortherhood of Electrical Workers, 313 F. Supp. 2d 213, 232 (S.D.N.Y. 2004).  In any event, the fact that more than 250 people aged 18-44 did not associate the name "Kargo" or the phrase "Powered by Kargo" with the goods or services that Kargo actually offers is clearly sufficient for Simonson to draw conclusions regarding the extent of consumers' awareness of Kargo's brand.

40

Accordingly, Kargo's application to preclude Simonson from testifying about the results of the ORC Survey is denied.

## CONCLUSION

For the foregoing reasons, Advance's motion to preclude the Jacoby Survey and accompanying testimony of Dr. Jacoby is GRANTED.

Advance's motions to preclude the reports and accompanying testimony of Nelson and Singer are GRANTED.

Advance's motion to preclude the testimony of Kargo's "rebuttal" experts, Winer and Kaplan, is DISMISSED AS MOOT.

Advance's motion to preclude Kargo from offering evidence of damages based on certain factual assertions contained in the Singer Report but not timely disclosed to Advance is DISMISSED AS MOOT.  Advance's motion to preclude Kargo from offering evidence of damages in excess of $10,400 is DENIED. Advance's motion to preclude Kargo from offering evidence that the cessation of Cargo magazine contributed to Kargo's damages is DENIED.  Advance's motion to preclude Kargo from offering damages evidence of lost direct customers is GRANTED.

Kargo's motion to preclude Simonson from testifying regarding the purported bias of Kargo's confusion and damages experts is DISMISSED AS MOOT.  Kargo's motion to preclude

Simonson from testifying regarding the results of the ORC Survey is DENIED.

The parties are directed to appear before the Court for a status conference on August 21, 2007, at 9:45 am.

**SO ORDERED.**

**Dated: New York, New York**
      **August   6   , 2007**

John F. Keenan

**JOHN F. KEENAN**
**United States District Judge**